## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JUANITA FAYE DOUGLAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 3:05-CV-0776-K |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b) and an order of the District Court in implementation thereof, the subject cause has previously been referred to the United States Magistrate Judge. The findings, conclusions, and recommendations of the Magistrate Judge, as evidenced by his signature thereto, are as follows:

Procedural History: On March 5, 2003, Plaintiff filed her application for Supplemental Security Income ("SSI") benefits alleging disability due to a heart murmur, depression and anxiety. (Administrative Record 12-17, 82 [Hereinafter Tr.].)

The Administrative Law Judge ("ALJ") conducted a hearing on November 18, 2004. (Tr. 261.) On December 23, 2004, the ALJ denied Plaintiff's request for SSI benefits, finding that she was not disabled and had the residual functional capacity to perform substantially all of a full range of sedentary work. (Tr. 17.) Ms. Douglas timely requested a review of the ALJ's decision by the Appeals Council, and on March 11, 2005, the Appeals Council denied her request. (Tr. 4.) Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

Plaintiff filed her federal complaint on April 20, 2005.  Defendant filed her answer on July 11, 2005.  On September 12, 2005, Plaintiff filed her brief and on November 9, 2005, Defendant filed her brief.

Standard of Review–Social Security Claims:  When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of whether: (1) the ALJ's decision is supported by substantial evidence and (2) the proper legal standard was applied.[1] *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment.  *Id.* at 1022 (quoting *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988)).  Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971)).

Discussion:  To prevail on a claim for SSI benefits, a claimant bears the burden of establishing that he or she is disabled, which is defined as "the inability to engage in any

---

[1]  "The scope of judicial review of a decision under the Supplemental Security Income Program is identical to that of a decision under the Social Security Disability Program."  *Harrell v. Bowen*, 862 F.2d 471, 475 n.4 (5th Cir.  1988) (citing *Davis v.  Heckler*, 759 F.2d 432, 435 n.1 (5th Cir.  1985)).  Likewise, the relevant laws and regulations governing the determination of disability are identical under both programs.  *Davis*, 759 F.2d.  at 435 n.1.

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.A. § 1382c(3)(A); 20 C.F.R. § 416.905(a).  Substantial gainful activity is defined as "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920.  Under the first four steps, a claimant has the burden of proving that her disability prevents her from performing her past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity that the claimant can perform.  *See*, *e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines ("Grid Rules") of the regulations, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, or by expert vocational testimony or other similar evidence.  *See*, *e.g.*, *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

In this case, the ALJ proceeded to step five and utilized the Grid Rules to determine that Ms. Douglas was not disabled.  (Tr. 12-17.)  He therefore denied Plaintiff's request for SSI benefits.  (Tr. 17.)

The documents contained in the administrative record reflect the following chronology of medical care:[2]

---

[2]  Defendant asserts that any evidence of a mental impairment prior to March 5, 2003,–the date on which Plaintiff applied for SSI benefits–is not relevant.  *See* 20 C.F.R. § 416.335.  While Defendant correctly points out that the relevant time period for purposes of awarding Plaintiff SSI benefits is from date on which she filed for benefits to the date of the

On June 13, 2001, Plaintiff saw cardiologist Dr. Gregory Redish for an initial visit. (Tr. 143.) Dr. Redish noted in Plaintiff's records that she was referred to him because she had suffered four miscarriages and had undergone four major heart surgeries. (Tr. 143.) Plaintiff reported suffering some heart palpitations when she overexerted herself. (Tr. 143.) Dr. Redish's examination of Plaintiff revealed a loud III/VI holosystolic heart murmur that radiated widely. (Tr. 144.) He also noted a wide splitting of the first heart sound, which was not accompanied by a gallop or rub. (Tr. 144.) Ms. Douglas saw Dr. Redish for a follow-up visit on August 10, 2001. (Tr. 142.) She reported some shortness of breath and heart pounding. (Tr. 142.) Dr. Redish performed an electrocardiogram ("EKG") on Plaintiff which showed a right bundle branch block, right axis deviation, probable left atrial enlargement and non-specific ST-T wave changes. (Tr. 142.)

Plaintiff next saw Dr. Redish on September 13, 2001. (Tr. 140.) She reported a lot of pelvic pain due to a growing uterine fibroid. (Tr. 140.) The doctor performed an EKG, which revealed no changes from Plaintiff's previous EKG. (Tr. 140.)

On October 9, 2001, Plaintiff saw Dr. Dale General, Ph.D., for an individual psychotherapy session. (Tr. 127.) Plaintiff, who was six months pregnant at the time of the session, described suffering sexual abuse as a child and described difficulties communicating with her husband. (Tr. 127.) She reported that she quit school in the 9th grade, had a limited

---

ALJ's decision, medical records from outside this time period may serve as some evidence that Plaintiff's mental impairment existed during the relevant time period. *See*, *e.g.*, *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (finding that evidence of a paranoid incident four years after the relevant time period was "not determinative of whether those events also took place [during the relevant time period], but is at least some evidence of the existence of the condition").

work history, suffered from heart ailments and abused alcohol, but quit drinking in December of 2000 following the death of her mother.  (Tr.  127-28.)  She also stated that she received psychiatric treatment in 1985 for unknown reasons.  (Tr.  128.)  Her husband was present at the session and reported that Plaintiff sometimes was threatening and physically aggressive towards others.  (Tr.  127.)  He explained that she suffered from mood swings, impulse-control problems, attention-seeking behavior and poor judgment.  (Tr.  127.)  The goals for treatment were for Ms. Douglas to get along with her husband and become more independent.  (Tr.  128.)  The doctor noted that he did not believe Plaintiff's mood was sufficiently stable to allow her to benefit from psychotherapy at the present time and he recommended that she be evaluated for psychiatric medication.  (Tr.  128.)  He diagnosed her with an unspecified, episodic mood disorder and gave her a Global Assessment of Functioning ("GAF")[3] score of 45.  (Tr.  128.)

On October 25, 2001, Plaintiff saw Dr. Redish.  She reported no cardiac complaints and Dr.  Redish's examination revealed no changes from previous visits.  (Tr.  138-39.)

Plaintiff saw Dr. Dante Burgos, a psychiatrist, on November 16, 2001.  (Tr.  131.)  Her chief complaint was that she had a quick temper.  (Tr.  131.)  She reported increased crying episodes and anger levels, low energy levels, irritability and explosive outbursts.  (Tr.  131.)  She denied any current suicidal or homicidal ideation, hallucinations or delusions and denied ever being hospitalized for psychiatric reasons or having a substance abuse history.  (Tr.  132.)  However, she reported that she was sexually abused by a cousin and attempted to hang herself at the age of twelve.  (Tr.  132.)  Ms.  Douglas also denied that any family members suffered from

---

[3]  According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") published by the American Psychiatric Association, a GAF score reports a person's "overall" psychological, social, and occupational functioning at the time the evaluation takes place. *Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV, 32 (4th ed. 1994).

psychiatric conditions.  (Tr.  132.)  She explained that she quit school in the eighth grade due to

behavior problems and had a limited work history because she usually quit her jobs as a result of

anger issues.  (Tr.  132.)

     Mr.  Douglas, Plaintiff's husband, arrived in the middle of the session and reported that

Plaintiff suffered explosive outbursts at least once or twice daily that consisted of yelling,

screaming, and other inappropriate behavior.  (Tr.  131.)  He reported that she had no friends due

to her behavior and that she engaged in child-like and impulsive behavior.  (Tr.  131.)  He also

stated that he worried that she could harm her baby if she got frustrated enough.  (Tr.  131.)

     After evaluating Plaintiff, Dr.  Burgos reported that Ms. Douglas was pleasant,

well-groomed and made good eye contact.  (Tr.  132.)  He also noted that her mood was

congruent and that her judgment and insight were fair.  (Tr.  132.)  He concluded that Plaintiff

was not at risk of harming herself or others.  (Tr.  132.)  Using the multiaxial assessment system

recommended by the American Psychological Association,[4] Dr.  Burgos diagnosed Ms.  Douglas

with the following conditions: (Axis I) mood disorder not otherwise specified, anxiety disorder

not otherwise specified, impulse control disorder not otherwise specified; (Axis II) deferred;

(Axis III) eight months pregnant; (Axis IV) occupational problems, other psychosocial

environmental problems, and (Axis 5) a GAF score of 50.  (Tr.  132.)  He prescribed Zoloft,

Depakote, and recommended that Ms.  Douglas continue attending individual therapy.  (Tr. 133.)

     On December 5, 2001, Plaintiff saw Dr. General for an individual therapy session.  (Tr.

---

[4]  The DSM-IV states that "a multiaxial system involves an assessment on several axes,
each of which refers to a different domain of information that may help the clinician plan
treatment and predict outcome."  *See* DSM-IV, *supra* note 3, at 27. The five axes are: (I) clinical
disorders, (II) personality disorders, (III) general medical conditions, (IV) psychosocial and
environmental problems and (V) global assessment of functioning.  *Id.*

125.)  Plaintiff reported improvement in her anger levels and greater stability of mood.  (Tr. 125.)  She reported that she was doing better with daily living skills and having fewer conflicts with her husband.  (Tr. 125.)  Dr. General noted that Ms. Douglas appeared to be more stable and less irritable.  (Tr. 125.)

On December 10, 2001, Plaintiff saw Dr. Redish.  (Tr. 136.)  Plaintiff reported having five to ten seconds of rapid heart palpitations early that morning.  (Tr. 136.)  She reported that she was increasingly short of breath and suffered from heartburn.  (Tr. 136.)  An examination of Plaintiff's cardiac symptoms revealed no changes from her previous visits.  (Tr. 136-37.)

Plaintiff saw Dr. Burgos on February 4, 2002.  (Tr. 130.)  She had given birth to a baby girl five weeks previously.  (Tr. 130.)  She reported that her husband didn't trust her and thought she was being unfaithful.  (Tr. 130.)  She also stated that she had stopped taking her medications, explaining that, though the medications were helpful, "its about me and my husband working out our problems."  (Tr. 130.)  Dr. Burgos recommended that she restart her medications and prescribed individual therapy.  (Tr. 130.)

On February 12, 2002, Plaintiff saw Dr. Redish.  (Tr. 135.)  Plaintiff reported that she had an uncomplicated birth approximately one month previously and that she did not experience cardiac problems during the birth or after the birth.  (Tr. 135.)  Dr. Redish noted no changes in Plaintiff's cardiac condition.  (Tr. 135.)

Five months later, on July 11, 2002, Plaintiff saw Dr. Dante Burgos.  (Tr. 130.)  She reported that she was not in therapy, was not taking her medications, and was still having problems with her husband.  (Tr. 130.)  Ms. Douglas requested medication for anxiety and anger control and asked to restart individual therapy with Dr. General.  (Tr. 130.)  Dr. Burgos

prescribed Depakote and Paxil.  (Tr. 130.)

On March 17, 2003, Plaintiff saw Susan Rauh, a psychiatric mental health nurse practitioner, at the Telecare Northstar medical clinic.  (Tr.  189.)  She brought her baby daughter to the treatment session.  (Tr.  189.)  Ms.  Douglas reported having problems with sleep, anxiety, depression, and feelings of anger and helplessness.  (Tr.  189.)  She described her history of being an abused and neglected child.  (Tr.  189.)  She reported threatening to shoot her husband the previous month because he wouldn't leave her alone.  (Tr.  189.)  Ms.  Rauh noted that Plaintiff had a blunted affect and incongruent mood, but that she was nurturing to her baby throughout the one hour session.  (Tr.  189.)  Ms.  Rauh completed a multiaxial assessment and found: (Axis I) generalized anxiety disorder and post-traumatic disorder; (Axis II) deferred; (Axis III) heart murmur, scoliosis, no joints in thumbs; (Axis IV) A, B, D, E, F, G[5] and (Axis V) a GAF score of 45.  (Tr. 189.)

Plaintiff returned to the Telecare Northstar clinic on March 21, 2003, and saw another psychiatric mental health nurse practitioner, Deborah Croissant.  (Tr.  183.)  Her chief complaint was that she was depressed and anxious.  (Tr.  183.)  She reported having: trouble sleeping, frequent nightmares, low motivation, "all right" energy levels, very poor concentration, no libido, and a poor appetite.  (Tr.  183.)  Plaintiff also stated that she did not have any friends or do any fun things and spent most of her time playing with her daughter.  (Tr.  183.)  Her goals were to find a place to live, to find a job, and to take care of her daughter.  (Tr.  183.)

Plaintiff reported that her depression and anxiety onset at age seven but that she had never attempted to commit suicide.  (Tr.  183.)  She stated that she had suffered severe trauma in

---

[5]  The medical records from the Telecare Northstar clinic do not contain a key for the coding of Plaintiff's conditions on Axis IV.

her lifetime, including sexual abuse by a cousin, emotional and physical abuse by her stepfather, and that she witnessed her step-brother's violent death and her sister's rape.  (Tr.  184.)  She also stated that she had suffered four miscarriages.  (Tr.  184.)  She denied ever abusing drugs or alcohol and stated that she was not currently taking any prescription medications.  (Tr. 185.)

Nurse Croissant observed that Plaintiff had: good hygiene, psychomotor retardation, a dysthymic mood, a congruent affect, a normal attention and concentration span, average intelligence, and fair insight and judgment.  (Tr. 185-86.)  Her assessment was: (Axis 1A) major depressive disorder, recurrent, severe without psychotic features; (Axis 1B) post-traumatic stress disorder; (Axis IIA) no diagnosis; (Axis IIIA) deferred; (Axis IV) B,C,D,F,G;[6] and (Axis V) a GAF score of 40.  (Tr.  188.)  Welbutrin and Trazadone were prescribed.  (Tr. 188.)

On April 3, 2003, Plaintiff saw Ms. Croissant at the Telecare Northstar clinic.  (Tr.  181.) She reported sleeping better and without nightmares and having more energy but also noted that she still was getting angry at her husband.  (Tr. 181.)  Ms. Croissant observed that Ms.  Douglas had poor hygiene, psychomotor agitation, a depressed mood, a congruent affect and fair judgment.  (Tr.  181-82.)  At the time Wellbutrin, Trazadone and Tegretol had been prescribed. (Tr. 182.)

On April 11, 2003, Plaintiff saw Dr. Olufemi Layeni, M.D. at the request of the Texas Rehabilitation Commission.  (Tr.  196.)  Plaintiff's chief complaint was "stress" and severe depression.  (Tr.  196.)  She stated that she had been irritable for the past eight years and depressed for the last five, with the depression increasing in the previous two and one half years. (Tr.  196.)  She also reported low energy levels, poor concentration, panic attacks, frequent

_____

[6] *See* note 5, *supra*.

9

crying spells, insomnia and nightmares.  (Tr.  196.)

Plaintiff indicated that she had received social security insurance benefits since the age of five due to a heart defect, and then due to an unspecified mental disability.  (Tr.  196.)  These benefits were terminated four years previously.  (Tr.  196.)  Plaintiff said that she was reapplying for benefits because she was unable to function in the workplace due to poor impulse control and violent thoughts.  (Tr.  196.)  She claimed to have lost at least eleven jobs in the previous four years due to her tendency to be verbally aggressive towards her bosses.  (Tr.  196.)   She said that her longest work period was for three months at Fry's Electronics.  (Tr.  198.)  She also reported that family members did not like to be around her because of her irritability and that her ex-husband recently divorced her because would often get angry at him and move out of the house.  (Tr. 196, 198.)  Plaintiff stated that she spent most of her days watching television, but that she also vacuumed, cleaned, washed dishes and cooked.  (Tr.  197.)

Ms.  Douglas speculated that she had numerous psychological problems because she witnessed her brother being fatally shot when she was ten years old and because both parents "died in her arms."  (Tr.  196-97.)  She explained that she previously was treated by a psychiatrist in 2000 but was forced to discontinue treatment for financial reasons.  (Tr.  197.)  She also reported that she went to a psychiatric counseling session at the Telecare Northstar clinic three weeks previously, and had received prescription medication, but had not seen any improvement in her condition.  (Tr.  197.)  She denied suicide attempts or alcohol abuse.  (Tr.  197.)

Dr.  Layeni noted that: Plaintiff's affect was in the normal range, her immediate recall was good, but her five-minute recall was poor and her insight was poor.  (Tr.  199.)  His

assessment was: (Axis 1) depressive disorder not otherwise specified, (Axis II) deferred, (Axis III) history of congenital heart defect, (Axis IV) lack of financial and social support, (Axis V) a GAF score of 65.  (Tr.  199.)   The doctor concluded that Plaintiff's prognosis was guarded, and he noted that her personality issues could be better clarified with psychological testing.  (Tr. 199.)

On April 18, 2003, Plaintiff was evaluated by Dr. Harold Nachimson, a specialist in internal medicine, at the request of the Texas Rehabilitation Commission.  (Tr.  201.)  Ms. Douglas complained of a rapid heart beat, a heavy feeling in her head, chest pain and constipation as well as feelings of nervousness, anxiety and anger.  (Tr.  201.)  She reported a history of cardiac problems, including four heart surgeries before the age of five, and that she had recently recovered from a kidney infection and might be undergoing surgery to remove a tumor in her ovary.  (Tr.  201.)  She reported taking Welbutrin, Trazodone, and Tegretol.  (Tr. 201.)  She said that her mother died of a brain hemorrhage and her father was murdered.  (Tr. 202.)

As part of her work history, Plaintiff reported that she was fired from her last job because she threatened to kill her employer.  (Tr.  202.)  She stated that she had eleven jobs in the previous four years but that she left or was fired from all of them.  (Tr.  202.)  She reported that she didn't do any housework, shopping or cooking.  (Tr.  203.)

Dr. Nachimson conducted a physical examination of Plaintiff and well as an X-ray and an EKG.  (Tr.  204.)  He noted a grade 3/6 systolic heart murmur mostly along the left sternal border with no radiation into the neck.  (Tr.  204.)  He also noted a mild trill over the precordium.  (Tr.  204.)  Plaintiff's X-ray revealed a mild prominence on the heart's right border.

(Tr. 204.)  The EKG revealed that the heart defect appeared to be a right bundle branch type.

(Tr. 204.)  His impression was that Plaintiff suffered from a congenital heart defect as well as a

personality disorder.  (Tr. 204.)

On May 1, 2003, Plaintiff saw Deborah Croissant at the Telecare Northstar clinic.  (Tr.

179.)  Plaintiff reported that she was "fine" and was no longer getting angry at her husband.  (Tr.

179.)  She also reported having good energy levels and appetite, no libido, "all right"

concentration and poor motivation.  (Tr. 179.)  Ms. Croissant noted that Plaintiff's psychomotor

skills were retarded, her mood was depressed, her affect was congruent and her judgment was

fair.  (Tr. 179-80.)  Plaintiff's prescribed medications were Welbutrin, Trazadone, and Tegretol.

(Tr. 180.)  Plaintiff returned two months later and saw Ms. Croissant on July 8, 2003.  (Tr.

208.)  She reported being off her medications for two weeks and that she felt like hurting

someone.  (Tr. 208.)  She also stated that she was sleeping restlessly and had nightmares, low

energy, no libido, little appetite, no motivation, and high anxiety.  (Tr. 208.)  Ms. Croissant

observed that Plaintiff had poor hygiene, psychomotor retardation, a depressed and irritable

mood and a congruent affect.  (Tr. 208.)  Ms. Douglas' medications were changed to

Trazadone, Tegretol, and Celexa.  (Tr. 209.)

After four and one half months, Plaintiff returned to the Telecare Northstar clinic on

November 24, 2003.  (Tr. 207.)  Plaintiff saw Colleen McQuaid, a psychiatric mental health

nurse practitioner.  (Tr. 207.)  Plaintiff explained that she had ceased taking her medications and

that she was anxious, irritable, was having suicidal thoughts and was not sleeping well.  (Tr.

207.)  Plaintiff reported working part time as a caretaker for elderly persons in the evenings.

(Tr. 207.)  She also remarked that she was living with her ex-husband and that he was

emotionally abusive.  (Tr.  207.)

Almost five months passed before Plaintiff returned to the Telecare Northstar clinic on April 16, 2004.  (Tr.  218.)  Plaintiff saw Janice Sloan, a psychiatric mental health nurse practitioner.  (Tr.  218.)  Ms.  Douglas reported that she had not taken any psychiatric medications since December of 2003 and that she was four months pregnant.  (Tr.  218.)  She said that she was anxious, had racing thoughts, and had trouble sleeping as well as had difficulty getting along with her ex-husband.  (Tr.  218.)  She reported recently losing a part-time job and that she was in a legal dispute over child support with her ex-husband.  (Tr.  218.)  She also reported suffering from hallucinations.  (Tr.  218.)  Ms.  Sloan's multiaxial diagnosis was: (Axis 1A) major depressive disorder recurrent, severe with psychotic features; (Axis 1B) post-traumatic stress disorder; (Axis 1C) impulse control disorder not otherwise specified; (Axis IIA) no diagnosis; (Axis IIIA) deferred; (Axis IV) A, B, C, D, E, F, G, H, I;[7] and (Axis V) a GAF score of 35.  (Tr.  219.)  Zoloft and Seroquel were prescribed.

Plaintiff saw Ms.  Sloan again on April 29, 2004.  (Tr.  217.)  She reported depression and trouble sleeping.  (Tr. 217.)  Ms.  Douglas returned to the clinic three weeks later, on May 20, 2004, and saw Ms. Sloan again.  (Tr.  216.)  She reported that she as not doing well and that she had suicidal thoughts.  (Tr.  216.)  She described getting into a verbal altercation at the food stamp office.  (Tr.  216.)  Ms.  Sloan stated that Plaintiff could benefit from mood stabilizers, but had none to give her.  (Tr. 216.)

On May 21, 2004, Plaintiff saw a Dr. Cameron at Parkland Memorial Hospital.  (Tr. 256.)  She reported that she suffered shortness of breath, which had worsened with pregnancy

---

[7] *See* note 5, *supra*.

13

and worsened when she climbed stairs. (Tr. 256.) Dr. Cameron diagnosed Ms. Douglas with supravalvular pulmonary stenosis and opined that her complaints of shortness of breath were likely unrelated to her pregnancy. (Tr. 257.) He planned to follow-up with Ms. Douglas after her delivery. (Tr. 257.)

On June 14, 2004, Plaintiff returned to the Telecare Northstar clinic and saw Janice Sloan. (Tr. 215.) Mr. Douglas, who, at that point, was Plaintiff's ex-husband, also attended the session. (Tr. 215.) Mr. Douglas reported that Plaintiff was sometimes rough with their child, that her activities of daily living had deteriorated over the past year, and that he was worried about the safety of their child. (Tr. 215.) He described having difficulty locating Plaintiff and their child the previous week. (Tr. 215.) Ms. Sloan observed that Plaintiff "smiled inappropriately" during her ex-husband's description of events. (Tr. 215.) When questioned by Ms. Sloan regarding her current mental health, Plaintiff denied feeling depressed. (Tr. 215.) Plaintiff reported that she was taking her medications, but was unhappy with the sedating effects of Seroquel. (Tr. 215.) Ms. Sloan noted that a limited number of psychiatric medications were available to Plaintiff due to her pregnancy. (Tr. 215.) She prescribed an increased dosage of Seroquel as well as Zoloft and Benadryl. (Tr. 215.)

On July 11, 2004, Plaintiff was seen by a doctor at Parkland Memorial Hospital. (Tr. 223.) Plaintiff reported suffering shortness of breath. (Tr. 223.) The doctor did not prescribe any new medications or treatments. (Tr. 223.) Plaintiff returned to the hospital the next day with complaints of chest pain and shortness of breath. (Tr. 231-32.) She was admitted as a patient. (Tr. 231.) A chest X-ray, an EKG, and a psychiatric consult were ordered. (Tr. 232.)

14

Dr. Michael Laughlin, a radiologist, examined Plaintiff's chest X-ray.  (Tr.  230.)  He noted that her heart was upper normal size with some prominence of the left trial appendage.  (Tr. 230.)  An EKG revealed mild left ventricular systolic dysfunction.  (Tr.  248.)  Dr. Aeschlemann, a psychiatrist, saw Plaintiff on July 14, 2004.  (Tr.  239.)  Plaintiff complained of mood swings, irritability, low energy, and low concentration.  (Tr.  239.)  Dr. Aeschlemann's diagnosis was: (Axis 1) major depressive disorder, severe and recurrent; (Axis II) none; (Axis III) congenital heart defect; (Axis IV) problems with support group, social environment, housing, education and access to heath care and (Axis V) a GAF score of 45.  (Tr.  240.)  Dr. Aeschlemann  recommended restarting Plaintiff on a higher dose of  Sertraline and discontinuing the use of Seroquel.  (Tr.  240.)  Plaintiff was discharged in good condition on July 15, 2004.  (Tr.  231.)

On July 25, 2004, Plaintiff was readmitted to Parkland Memorial Hospital because of chest pain and the premature delivery of her baby.  (Tr.  221-222.)  Plaintiff was seen by a cardiologist and had at least one EKG.  (Tr.  222.)  She experienced no further chest pains after admission.  (Tr.  222.)  Ms.  Douglas was also seen by a psychiatrist, who determined that her major depressive disorder was stable, continued her on Zoloft and prescribed Ambien.  (Tr. 222.)  Ms.  Douglas was also diagnosed with, and treated for, gestational diabetes.  (Tr.  222.)  She was discharged on August 13, 2004, in stable condition.  (Tr.  221.)

On August 16, 2004, Plaintiff saw Janice Sloan at the Telecare Northstar clinic.  (Tr. 213.)  Plaintiff reported a steep decline in her mental health.  (Tr.  213.)  She said that she was very depressed, was having trouble sleeping and was living in a shelter.  (Tr.  213.)

Plaintiff testified on her own behalf at the administrative hearing.  (Tr.  267.)  She

15

testified that she dropped out of school in the middle of the eighth grade. (Tr. 271.) She stated that she had two young children but that they did not live with her because she voluntarily relinquished custody of them to her ex-husband so that Child Protective Services would not forcibly remove them from her care. (Tr. 276-77.) Regarding her past work history, she testified that she worked as a cashier in various restaurants but was no longer able to perform that type of work due to her heart problems. (Tr. 271-72.) Specifically, she stated that after standing for longer than an hour, she would experience a rapid heart beat and shortness of breath. (Tr. 272-73.) She also stated that her longest period of employment was three months and explained that she had never been able to stay employed for long because she easily got upset and would get into verbal altercations with co-workers and customers. (Tr. 278-83.) She stated that she had always left or been fired from jobs because of her inability to control her temper. (Tr. 287-88.) She admitted that she once threatened to kill a customer and once threatened her manager at Arby's. (Tr. 285.) Ms. Douglas also explained that her psychiatric medications did not keep her from getting angry. (Tr. 285.)

**The ALJ Applied the Correct Standard to the "Severity" Requirement**

Plaintiff first argues that the ALJ applied an incorrect legal standard for assessing the severity of her impairment. In this case, the ALJ found that Plaintiff's mental impairment was "not severe" at step two in the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. In step two of the evaluation process, the Commissioner must determine whether the claimant has a "severe medically determinable physical or mental impairment...or a combination of impairments that is severe."[8] § 416.920(a)(4)(ii). District courts in the Fifth Circuit have held

---

[8] In this second step, the Commissioner must also find that the impairment meets the duration requirement in § 416.909.

that the second step"logically" involves the following three distinct inquiries: (1) whether the allegedly disabling condition constitutes an "impairment;" (2) if the condition can be categorized as an impairment, whether the impairment constitutes a "severe impairment" and (3) if the condition cannot be considered a severe impairment, whether the combination of the claimant's impairments can be cumulatively considered a "severe impairment." *See Henson v. Barnhart*, 373 F. Supp. 2d 674, 682 n.16 (E.D. Tex. 2005). If an impairment is neither found to be "severe" in and of itself, or in combination with other impairments, it is not considered during the latter stages of the sequential evaluation process. § 416.920(a)(4)(ii), (c).

When a claimant's alleged impairment is mental, rather than physical, the ALJ must evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings." § 416.920a(b)(1). If, after this review of the claimant's medical records, the ALJ determines that the plaintiff has a an impairment, the ALJ is required to rate the degree of functional limitation resulting from the impairment. § 416.920a(b)(2). A plaintiff's degree of functional limitation is rated in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. § 416.920a(c)(3). If the ALJ rates the degree of the claimant's limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, the claimant's impairment may be rated "not severe" unless "the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." § 416.920a(d)(1). "Basic work activities" include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and

usual work situations; and (6) dealing with changes in a routine work setting.  § 416.921(b).

The Fifth Circuit Court of Appeals has consistently held that the governing regulations should not be used to summarily dismiss a claim at step two of the evaluation process where it likely that the claimant is "in fact, unable to perform 'substantial gainful activity.'"  *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir.  2000) (quoting *Anthony v.  Sullivan*, 954 F.2d 289, 293 (5th Cir.  1992)).  In *Stone v.  Heckler* the court determined that, "an impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's work, irrespective of age, education or work experience."  752 F.2d 1099, 1101 (5th Cir.  1985) (citation omitted); *see also Loza*, 219 F.3d at 391-92 (noting that the circuit continues to apply the definition of "not severe" from *Stone*); SSR 85-28 (S.S.A. 1985) (acknowledging and noting agreement with *Stone*'s definition of "not severe").

In his opinion, the ALJ quoted the definition of a "non-severe" impairment from § 416.921 and cited *Stone v.  Heckler*.  (Tr.  13.)  Because the court cited *Stone* within its discussion of the severity requirement, this court may not assume that the ALJ applied an incorrect standard.  *See Stone*, 752 F.2d at 1106.  Plaintiff has not pointed to, and the Magistrate Judge has not found, any other evidence in the record that demonstrates that the ALJ applied a definition of "severe" that differs from the interpretation developed by the Fifth Circuit Court of Appeals.  Therefore, Plaintiff's first ground for relief is without merit.

**The ALJ's Determination at Step Two is Not Supported By Substantial Evidence**

Plaintiff next argues that the ALJ erred at step two of the sequential evaluation process because he wrongly determined that Plaintiff's mental impairment was not severe and therefore

did not consider the effect of this impairment during the latter stages of the sequential evaluation process.

In addressing Plaintiff's mental impairment, the ALJ relied almost exclusively on the report of Dr. Layeni describing the examination on April 11, 2003, (Tr. 196-99), in which the doctor assigned a GAF score of 65,[9] and rejected the low GAF ratings given by others on the basis that they were inconsistent with the narrative reports of her capabilities and limitations, (Tr. 13-14).

As noted above, Dr. Layeni was not the only person to report a GAF score. In November 2001, Dr. Dante Burgos gave her an Axis V GAF score of 50. Following the filing of her application for benefits, between March 2003 and July 14, 2004, Ms. Douglas was given Axis V GAF ratings which ranged between 35 and 45.[10] With the exception of Dr. Aeschlemann, the assessments were made by psychiatric mental health nurse practitioners. Although the regulations do not include these health care professionals within the definition of

---

[9] A GAF score of from 61 to 70 indicates that a person has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* DSM-IV, *supra* note 3, at 34.

[10] A GAF score between 31 and 40 indicates that a person suffers "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *See* DSM-IV, *supra* note 3, at 34. A GAF score between 41 and 50 indicates that a person suffers "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See id.*

"acceptable medical sources," they are persons whose information may be used to determine the severity of impairments.  *See* § 416.913(a)(1)-(2), (d)(1).

Although Dr.  Aeschlemann was a treating physician and saw Plaintiff more than a year after the date of Dr.  Layeni's examination, the ALJ did not address the twenty point difference in their Axis V GAF ratings, nor did he give any explanation for rejecting Dr.  Aeschlemann's lower rating.  Conspicuous by its absence is any discussion of the ratings given by the several psychiatric mental health nurse practitioners.

In his report, Dr.  Layeni described Plaintiff's daily and social functioning.  In his findings, the ALJ noted that Plaintiff reported poor impulse control, but relied principally on the assessment of daily activities.  He further concluded that her lower GAF scores were inconsistent with the narrative reports of her capabilities.  The record contains ample uncontradicted evidence of conduct consistent with behavior deficits listed in GAF ratings between 31 and 40 and 41 and 50.  Plaintiff's work history, (Tr.  64-69), reflects that she had eleven jobs in a four year period, the longest employment lasting but three months.  She testified that she was fired from each job due to her lack of temper control, involving at least two instances in which threats were made against others.  The record shows that she had no social activities, that she and her husband had divorced, and that at the time of the administrative hearing her children were in the custody of her ex-husband in order to avoid having them removed by action of Child Protective Services.  In August 2004, Plaintiff was living in a shelter.[11]  None of these circumstances are addressed by the ALJ and his finding that Plaintiff's capabilities are inconsistent with the narrative reports is

---

[11]  All of these circumstances are indicative of mental impairments which had more than a "minimal effect" on her ability to function and which could be expected to "interfere" with her ability to work.  *Stone*, 752 F.2d at 1101.

not supported by substantial evidence.[12]

Moreover, since the ALJ found her mental impairments to be non-severe, (Tr. 14), which was not supported by substantial evidence, it resulted in the erroneous reliance on the Grids in the successive steps of the sequential review process.[13] *See Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) ("Use of the 'Grid Rules' is appropriate when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.").

---

[12] It is noteworthy that Dr. Layeni qualified his assessment somewhat by observing that personality issues could be better clarified with psychological testing. (Tr. 199.) The record does not contain any evidence of such testing.

[13] Additionally, while not raised as an argument by Plaintiff, it also appears that the ALJ failed to consider whether Plaintiff's mental impairment was severe *in combination* with her physical impairment. *See* § 416.920(a)(4)(ii).

There is also some suggestion in the record that Plaintiff's mental condition improved when she took prescribed medication and that it deteriorated when she failed to follow her prescribed regimen. Whether her condition could be improved with palliative treatment may affect the ultimate determination of whether she is disabled. However, since the Commissioner did not address or rely on such factors in denying her claim, it cannot substitute for substantial evidence to support the decision rendered.

**RECOMMENDATION:**

For the forgoing reasons, it is recommended that the District Court enter its order

REVERSING the decision of the Commissioner and REMANDING for additional proceedings

consistent with this recommendation.  A copy of this recommendation shall be transmitted to

counsel for the parties.

Signed this 1sth day of June, 2006.

_Wm. F. Sanderson Jr._
Wm. F. Sanderson Jr.
United States Magistrate Judge

<u>NOTICE</u>

In the event that you wish to object to this recommendation, you are hereby notified that
you must file your written objections within ten (10) days after being served with a copy of this
recommendation.  Pursuant to *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir.
1996)(*en banc*), a party's failure to file written objections to these proposed findings of fact and
conclusions of law within such ten (10) day period may bar a *de novo* determination by the
district judge of any finding of fact and conclusion of law and shall bar such party, except upon
grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and
conclusions of law accepted by the district court.